IN RE WOODLAWN COMMUNITY
DEVELOPMENT CORP.,

                    Debtor.

WOODLAWN COMMUNITY DEVELOPMENT
CORP.,

                    Appellant,

      v.

OFFICIAL COMMITTEE OF UNSECURED
CREDITORS,

                    Appellee.

No. 19 CV 1605

Judge Manish S. Shah

Appeal from the United States
Bankruptcy Court for the
Northern District of Illinois,
No. 18-29862.

**MEMORANDUM OPINION AND ORDER**

For almost 50 years, Dr. Leon Finney ran the Woodlawn Community Development Corporation, a nonprofit organization that provided affordable housing and advocated for social justice in the Woodlawn neighborhood on the south side of Chicago. The organization had a board of directors and senior-level managers in place, but, in practice, Finney singlehandedly ran the organization with nearly unlimited discretion. Among his decisions with dire consequences for the organization, Finney diverted over a million dollars in employee payroll taxes into Woodlawn's operating account. The IRS tax lien that followed then caused Woodlawn to file a Chapter 11 bankruptcy petition. Woodlawn's unsecured creditors moved the bankruptcy court to appoint a trustee under 11 U.S.C. § 1104(a) to take over management of the debtor's estate. The unsecured creditors' committee, the U.S.

Trustee, and the Chicago Housing Authority, Woodlawn's largest client, all supported appointment of a trustee.

After three hearings, the bankruptcy judge granted the motion. She found that Finney's conduct amounted to gross mismanagement, fraud, and self-dealing. *See* 11 U.S.C. § 1104(a)(1). And although Woodlawn had hired a member of its board of directors to be its new CEO, the judge found that, overall, Woodlawn's management had continued largely unchanged. A trustee would be in the creditors' interest, according to the judge, because the creditors had lost confidence in Woodlawn's management. *See* 11 U.S.C. § 1104(a)(2). Woodlawn appeals the order appointing a trustee, insisting that the court insufficiently weighed Woodlawn's change in management. The bankruptcy judge did not abuse her discretion in appointing a trustee, and the order is affirmed.

## I.   Legal Standards

A reviewing court assesses the bankruptcy court's factual findings for clear error and its legal conclusions de novo. *In re Marcus-Rehtmeyer*, 784 F.3d 430, 436 (7th Cir. 2015). Whether to appoint a trustee under § 1104(a) is a discretionary decision, affirmed unless it is an abuse of discretion. *In re López–Muñoz*, 866 F.3d 487, 495 (1st Cir. 2017); *see Wiese v. Cmty. Bank of Cent. Wis.*, 552 F.3d 584, 589 (7th Cir. 2009).

## II.   Jurisdiction

A federal district court has jurisdiction to hear "appeals from final orders of a bankruptcy court." *In re Sobczak-Slomczewski*, 826 F.3d 429, 431 (7th Cir. 2016); *see*

28 U.S.C. § 158(a)(1). A federal district court also has discretion to accept jurisdiction over interlocutory appeals under 28 U.S.C. § 158(a)(3).

Woodlawn asserts that the appointment of a Chapter 11 trustee is a final order, appealable as of right. The U.S. Trustee argues that the appointment of a Chapter 11 trustee is an interlocutory order, so this court has only discretionary jurisdiction, and urges dismissal of the appeal.[1] Woodlawn does not respond to the Trustee's arguments about discretionary jurisdiction.

In the "strict sense," a Chapter 11 bankruptcy is not final "until a plan of reorganization is confirmed." *In re UAL Corp.*, 411 F.3d 818, 821 (7th Cir. 2005). But the concept of finality in bankruptcy is "considerably more flexible" than in other civil appeals. *Schaumburg Bank & Tr. Co. v. Alsterda*, 815 F.3d 306, 312 (7th Cir. 2016). That is because bankruptcy cases involve "many claims and problems," each of which "may come to a final conclusion before the estate has been wrapped up." *Id.* at 311 (quoting *In re Bulk Petro.*, 796 F.3d 667, 670 (7th Cir. 2015)); *see also Bullard v. Blue Hills Bank*, 135 S. Ct. 1686, 1692 (2015). To determine finality, courts look to whether the bankruptcy court's decision "finally disposed of a discrete dispute within the larger case." *Schaumburg Bank*, 815 F.3d at 312. If the court's order "conclusively resolves" the sort of dispute that would be a "stand-alone case outside of bankruptcy," the order is final. *Matter of Anderson*, 917 F.3d 566, 569 (7th Cir. 2019).

---

[1] The U.S. Trustee plays a "watchdog role" in bankruptcy cases, and is a party in interest who may be heard on cases under Chapter 11. *In re C.P. Hall Co.*, 750 F.3d 659, 661 (7th Cir. 2014); *see* 11 U.S.C. § 1109.

The Seventh Circuit, without specific analysis, included appointment of a trustee in a list of final, appealable orders from a bankruptcy court. *Matter of Wade*, 991 F.2d 402, 406 (7th Cir. 1993) (listing appealable bankruptcy court orders, including "appointments of trustees"). Other circuits find that such an order is final because, once a bankruptcy court appoints a trustee, there is "nothing more for the bankruptcy court to do." *Ritchie Special Credit Investments, Ltd. v. U.S. Tr.*, 620 F.3d 847, 852 (8th Cir. 2010). It makes little sense to delay reviewing the appointment of a trustee (or denying one) until the bankruptcy case is over. If a court on appeal were to reverse the appointment of a trustee, that decision could "jettison years of bankruptcy infighting, compromise and final determinations" only to "have the proceedings begin again from scratch." *In re Marvel Entm't Grp., Inc.*, 140 F.3d 463, 470 (3d Cir. 1998); *see also Ritchie*, 620 F.3d at 853. Thus, the circuit courts to have considered the question categorize the appointment of a trustee as a final appealable order. *Ritchie*, 620 F.3d at 853; *In re Marvel*, 140 F.3d at 470; *In re Plaza de Diego Shopping Ctr., Inc.*, 911 F.2d 820, 826 (1st Cir. 1990); *Comm. of Dalkon Shield Claimants v. A.H. Robins Co.*, 828 F.2d 239, 241 (4th Cir. 1987).

I agree. The bankruptcy court's order here conclusively resolved a discrete dispute—whether Woodlawn's internal management or an independent trustee would oversee Woodlawn's reorganization. That decision had significant consequences for Woodlawn and the creditors going forward. *Cf. Schaumburg Bank*, 815 F.3d at 314 (finding order not final where dispute was "too small a litigation unit to justify treatment as a final judgment"). Moreover, treating the appointment of a

trustee as final does not run the risk of piecemeal judgments, the concern that motivates finality rules in ordinary civil lawsuits. *See Bullard*, 135 S. Ct. at 1692. It makes sense to review the order shortly after the court decides it, rather than waiting until the Chapter 11 bankruptcy is technically final. As the Eighth and Third Circuits noted, to delay review would potentially upend years of work. Consistent with the liberal finality standards in bankruptcy law, an order appointing a trustee resolves a discrete dispute on the merits and is a final order.

The U.S. Trustee relies on *Matter of Cash Currency Exch., Inc.*, 762 F.2d 542 (7th Cir.), *cert. denied*, 474 U.S. 904 (1985), which held that the appointment of a trustee under 11 U.S.C. § 1104 was interlocutory and not appealable as of right. But that same year, the Seventh Circuit heard an appeal from an order appointing a trustee without discussing jurisdiction. *In re Reid*, 773 F.2d 945 (7th Cir. 1985). A few years later, in *In re Klein*, 940 F.2d 1075, 1076–77 (7th Cir. 1991), the court questioned its holding in *Cash Currency*. It noted that, in light of the apparent conflict between *Cash Currency* and *Reid*, "the appealability of trustee appointments in Chapter 11 proceedings appears to be an open question in this circuit." *Id.* Two years later, the court included trustee appointments in its list of final orders in *Wade*. The court's treatment of the issue suggests that appointment of a trustee is a final, appealable order, and nothing indicates a considered choice to create a split among the circuits.

Because the bankruptcy court's order resolved a discrete dispute, the order was final and appealable as of right.

## III.  Background

In 1960, 100 neighborhood associations, religious organizations, and civic groups created the Woodlawn Organization to revitalize the Woodlawn neighborhood on the south side of Chicago. [21-1] at 11.[2] In 1972, Woodlawn Community Development Corporation (Woodlawn) formed to manage real estate development for the Woodlawn Organization. [21-1] at 11. Woodlawn later developed ten construction projects; by 2018, Woodlawn managed 4,800 public housing apartments across 14 properties. [21-1] at 11. Woodlawn owned some of the properties outright, and managed others that were owned by the Chicago Housing Authority, Woodlawn's largest client. [21-1] at 437, 457, 473. Until October 2018, Dr. Leon Finney was Woodlawn's President and CEO. [21-1] at 10.

Woodlawn owned a building at 1500 East 63rd Street. [21-1] at 142, 441, 460. A real estate company that Finney owned, Lincoln South Central Real Estate Corporation, managed that property. [121-1] at 142, 157, 186, 441, 460. Lincoln South collected rent from the tenants, and was supposed to pay that rent to Woodlawn. [121-1] at 157, 186. For about seven years, Lincoln South never paid Woodlawn any rent that it collected from that property. [21-1] at 143, 186, 233, 460, 468.[3]

---

[2] Citations are to the appendix furnished by the U.S. Trustee. [21-1]. Page numbers are taken from the CM/ECF header placed at the top of filings.

[3] At a creditors' meeting, Finney stated that Lincoln South had paid rent, but "may" have been "late" "at times"; he could not remember the last time Lincoln South had paid rent to Woodlawn. [21-1] at 233. The judge found that Finney's statement that he had paid some rent was not enough to rebut the "implicit admission" that Finney kept all the rent from the tenants without paying Woodlawn, and, in any event, Woodlawn's general counsel testified at a creditors' meeting that Lincoln South had never paid rent. [21-1] at 461, 468.

Sometime around the beginning of 2017, Woodlawn changed payroll processors. [21-1] at 84, 268, 459. Woodlawn's CFO, Amy Mohammad, began handling payroll taxes internally. [21-1] at 84, 89. Finney told the new processor that Woodlawn would pay its employee payroll taxes itself. [21-1] at 135, 149, 185, 219, 459. Instead of paying employee payroll taxes, Finney moved the money from Woodlawn's payroll account into its operating account, and took $150,000 of that money to prevent foreclosure on one of Woodlawn's properties. [8] at 67–69, 220, 224, 268–69, 289, 457, 459. Woodlawn failed to pay payroll taxes for the second and fourth quarters of 2017 and the first quarter of 2018, and the IRS filed federal tax liens in the amount of $1.5 million to $1.8 million. [21-1] at 13, 185, 457.[4]

In October 2018, Finney told Woodlawn's board of directors that the organization had to file for bankruptcy, and that he was ill and could no longer serve as CEO. [21-1] at 307. On October 24, 2018, Woodlawn filed a voluntary petition for relief under Chapter 11 of the bankruptcy code. [21-1] at 3.[5] Shortly after filing the petition for bankruptcy, Finney fell ill and began an extended medical leave. [21-1] at 200, 208, 298.

---

[4] Some of the parties' filings estimated the number to be $1.8 million, but the bankruptcy judge used the lower number in her findings of fact. [21-1] at 457.

[5] In an affidavit attached to the bankruptcy petition, Finney stated that he had been "completely surprised" by Woodlawn's unpaid tax liabilities. [21-1] at 13. At a creditors' meeting, he admitted that he had directed the diversion of that money. [21-1] at 220–21. The bankruptcy judge found that Finney made a false statement when he said he was surprised by the unpaid tax liability; the judge was "appalled" by that dishonesty. [21-1] at 360, 458–59.

At the same time, Woodlawn hired Dr. Clarence Nixon, a longtime member of Woodlawn's board of directors, to serve as a consultant during the bankruptcy case. [21-1] at 19, 30, 186, 248, 461. A few days after filing the Chapter 11 petition, Woodlawn moved for authorization to use cash collateral, and asked the court to authorize paying Nixon $35,000 a month as a consulting fee. [21-1] at 19, 30, 186, 248. The Official Unsecured Creditors' Committee and the U.S. Trustee both objected to that consulting fee. [21-1] at 32, 186, 275, 461–22. The judge granted Woodlawn's motion to use cash collateral, but stated that the consulting fee to Nixon "shall not be paid until further order of the Court." [21-1] at 32. Woodlawn removed Nixon from the cash collateral order, but paid him $35,000 anyway. [121-1] at 187, 461. Woodlawn characterized the payment as an initial bonus fee instead of a consulting fee. [21-1] at 191–92, 298. In late November, Woodlawn hired Nixon as interim CEO and president, with his employment dating back to October 24, the date Woodlawn filed for bankruptcy. [21-1] at 73, 76, 191, 308. Nixon initially refused to return the $35,000, but, after the Committee threatened to move to appoint a trustee, Nixon returned the money at the end of January. [21-1] at 187. Finney, meanwhile, remained on sick leave through December. [21-1] at 146, 206, 298, 311–12. Woodlawn paid Finney $8,812 in December 2018, even though the cash collateral order did not authorize any payments to Finney. [21-1] at 187, 298.

Nixon replaced Finney as CEO, but Woodlawn's leadership otherwise remained the same. [21-1] at 465. As of February 2019, Leon Jackson was still the chairman of the board of directors. [21-1] at 209, 339, 467. Finney's daughter, Kristin

Finney-Cook, had been on the board since 2002 and remained a director. [21-1] at 210, 467. Two other directors stayed on the board. [21-1] at 209. The acting controller, Raymond Smith, had been in that role for about 10 years. [21-1] at 212, 468. Both Smith and Woodlawn's in-house counsel, Georgette Reynolds, remained in the same positions after Nixon replaced Finney. [21-1] at 468. Finney continued participating in Woodlawn's management as a volunteer. [21-1] at 75, 77, 246, 309, 465.[6]

As of November 2018, Nixon had not taken any steps to collect rent from Lincoln South. [21-1] at 143. Sometime before February 2019, Nixon requested an accounting from Lincoln South, but never made any formal demand for unpaid rent. [21-1] at 311, 328–29, 465. According to Nixon, Finney had committed to paying the unpaid rent, but Nixon did not know whether Finney had put that promise in writing, or how much rent Lincoln South owed. [21-1] at 329.

On February 5, 2019, the Committee moved to appoint a Chapter 11 trustee under 11 U.S.C. § 1104(a). [21-1] at 184–85. The statute provides that, at any time after the commencement of a case, a bankruptcy court shall order the appointment of a trustee either "for cause," "including fraud, dishonesty, incompetence, or gross mismanagement" by "current management," 11 U.S.C. § 1104(a)(1), or if the appointment of a trustee is in the "interests of creditors." *Id.* § 1104(a)(2). The Committee argued that Woodlawn had engaged in gross mismanagement and "potential fraud, dishonesty and incompetence." [21-1] at 185. The Committee listed

---

[6] Mohammad, the former CFO, left Woodlawn in the beginning of 2018. [21-1] at 215. Smith, the controller, reported to Mohammad, who reported directly to Finney. [21-1] at 90–91.

several examples, including the unpaid payroll taxes; the $35,000 payment to Nixon in violation of the cash collateral order; failure to collect rent from Lincoln South; and failure to pay insurance premiums. [21-1] at 185–86.

A week later, the parties appeared before the bankruptcy judge for a hearing on the Committee's motion. [21-1] at 256.[7] At the hearing, counsel for the CHA noted that the agency supported the appointment of a trustee, did not support "any application to employ Mr. Nixon," and had "lost all faith" in Woodlawn's management. [21-1] at 273–74. The judge said she was "very seriously thinking" about granting the motion for appointment of a trustee, and was surprised that the Committee hadn't filed its motion earlier. [21-1] at 258, 272, 278, 289.

Woodlawn requested an evidentiary hearing. [21-1] at 258, 269. The judge noted that Woodlawn had had "plenty of time" to anticipate a motion for a trustee, and rejected the idea that an evidentiary hearing was necessary, because the facts "jump[ed] off the page." [21-1] at 260. Nevertheless, she said that if Woodlawn convinced her that there were any disputed facts that warranted exploration at an evidentiary hearing, she would consider holding one; she continued the hearing for a week and told Woodlawn's counsel to file a written response to the Committee's motion. [21-1] at 278–79, 291.

---

[7] At each of the court hearings, counsel appeared and represented the following entities: the U.S. Trustee; the CHA; the Committee; Woodlawn; Lakeside Bank, a secured creditor, [21-1] at 395–96; and the Chicago Regional Council of Carpenters and Welfare Funds, an unsecured creditor, [21-1] at 56. [21-1] at 256, 348, 424.

In its written submission, Woodlawn argued that appointment of a trustee was not justified because new management had taken over the organization, independent from Finney's mismanagement. [21-1] at 294–304. It also promised to file a reorganization plan in another week, which provided for a $2.8 million infusion that Woodlawn would use to pay its creditors. Woodlawn argued that it was in the interests of the creditors to allow its reorganization plan, rather than appoint a trustee, which, it argued, would lead to liquidation. [21-1] at 303.

At the next hearing, the judge said she was still considering holding an evidentiary hearing based on Woodlawn's written submission. [21-1] at 368, 372–73. She asked Woodlawn's counsel where the money for the proposed reorganization was coming from, and counsel explained that the cash infusion would come from the sale of two properties by other nonprofit organizations that Finney managed. [21-1] at 325–26, 370. The judge continued the hearing for another week, and directed counsel for the Committee to respond to Woodlawn's written submission. [21-1] at 372. On February 21, 2019, Woodlawn filed its reorganization plan. [21-1] at 381–416.

On February 27, 2019, the judge orally granted the motion to appoint a trustee. [21-1] at 451. Although counsel for Woodlawn again asked for an evidentiary hearing, the judge determined that no hearing was warranted since there were no disputed facts. [21-1] at 431–32, 452. The judge found it "abundantly clear" that there was "no reason for putting anybody on the stand." [21-1] at 433.

The judge determined that the Committee needed to prove cause for a trustee only by a preponderance of the evidence, not clear and convincing evidence. [21-1] at

454–55. Although some bankruptcy courts required the movant to make the case for a trustee by clear and convincing evidence, the bankruptcy judge agreed with the Eighth Circuit Bankruptcy Appellate Panel that a preponderance standard was correct under Supreme Court precedent. [8] at 64–65 (first citing *In re Keeley vs. Grabanski Land P'ship*, 455 B.R. 153, at 162–63 (B.A.P. 8th Cir. 2011), then citing *Grogan v. Garner*, 498 U.S. 279 (1991)). However, the judge noted that under either standard, she would grant the motion. [21-1] at 456, 471.

The judge found that a trustee was justified under both 11 U.S.C. § 1104(a)(1)—for fraud, dishonesty, incompetence, or gross management—and (a)(2)—because it was in the interests of the creditors. [21-1] at 452, 471–72. Under § 1104(a)(1), she cited Finney's diversion of payroll taxes, which she called "at least malfeasance," as well as "fraud," "dishonesty," and "gross mismanagement." [21-1] at 457, 460, 471.[8] The judge likened the move to "theft of the employees' wages." [21-1] at 458. Also, she highlighted that Finney had lied when he said that he had been surprised by the unpaid taxes, because he later admitted that he had directed the misappropriation of the payroll tax money. [21-1] at 458. She also cited Woodlawn's failure to collect rent from Lincoln South, which she called an "obvious case of self-dealing." [21-1] at 460–61, 471. She noted that Woodlawn had failed to "prioritize and maintain insurance," and that the $35,000 payment to Nixon, in violation of the

---

[8] The court did not characterize this conduct as incompetent, because it was intentional. [21-1] at 458.

court's cash collateral order, was "at a minimum, post-petition gross incompetence or mismanagement." [21-1] at 462, 471.

Woodlawn largely did not contest the judge's factual findings, but instead argued that any mismanagement occurred under Finney's leadership. [21-1] at 463. Since Nixon had replaced Finney as CEO and president, Woodlawn argued, it was under new management and a trustee was improper. [21-2] at 463. The judge disagreed. She found that current management was "nowhere near free from the taint of prior management," because the current board of directors was "the exact same" and management had "continued, almost seamlessly, into the present moment." [21-1] at 435, 464, 467, 470. And, the judge noted, the in-house counsel and controller either knew or should have known about the unpaid rent and payroll taxes. [21-1] at 469. Management decisions implicated more than one person, and Woodlawn's collective management team had "permitted all the instances of fraud, dishonesty, mismanagement, or incompetence." [21-1] at 469–70.

The judge also rejected Woodlawn's argument that Nixon's appointment purged the taint of Finney's misconduct, since Nixon had been on the board of directors while Finney was mismanaging the organization. [21-1] at 464–65. Further, Nixon had not taken adequate steps to collect any rent that Lincoln South owed, or canceled the lease with that group. [21-1] at 464. Thus, the judge found that Nixon was "unwilling to take a hard position" against Finney, who had been keeping "significant amounts of money owed" to Woodlawn. [21-1] at 465–67. The judge also found it "distressing" that Finney remained involved with Woodlawn as a volunteer;

he still physically visited Woodlawn's offices and "still influenc[ed Woodlawn's] affairs" despite "his admitted malfeasance." [21-1] at 465, 467. Finally, the judge rejected Woodlawn's argument about its new management because Woodlawn lacked internal controls and management tools to prevent such misconduct from happening—the judge found that such controls had not been in place when Finney was CEO, and Nixon had not instituted sufficient safeguards since taking over. [21-1] at 470–71.

The judge also relied on § 1104(a)(2). [21-1] at 472–73. She asked the creditors present whether "the creditors are all in favor of this," and observed that all of the creditors' attorneys were "shaking their heads yes." [21-1] at 436, 447. In other words, "the only party opposing" appointment of a trustee was Woodlawn itself. [21-1] at 436, 447. All of the creditors who had participated in the case supported the appointment of a trustee, including the Committee and the CHA—Woodlawn's principal client. [21-1] at 473. The judge stated that she had considered Woodlawn's reorganization plan, but was not persuaded, and neither were the creditors, that Woodlawn's reorganization plan had "any real prospect for acceptance or success." [21-1] at 473–74.

Finally, the judge noted that she did not "like to appoint a trustee," and had never done so with a nonprofit organization before. [21-1] at 427, 434–35. She acknowledged that Woodlawn played a "role in the community" and had done "plenty of good." [21-1] at 433. The judge thus noted that it was "certainly not [her] goal" to dismantle Woodlawn or fire employees. [21-1] at 433–34, 436. Rather, her goal was

to appoint an independent third party to remedy the ongoing problems, improve the organization's functioning, and move things forward. [21-1] at 428, 433–34, 474. She hoped that appointing a trustee would have a "positive impact" on Woodlawn. [21-1] at 451.

## IV.   Analysis

Woodlawn says that the bankruptcy judge erred by failing to conduct an evidentiary hearing before appointing the trustee. And, it argues, she abused her discretion in appointing a trustee both for cause and in the interests of the creditors, because Woodlawn was under new management and had offered the court a reorganization plan. The U.S. Trustee and the Committee argue that the bankruptcy judge appropriately exercised her discretion.

### A.   Standard of Proof

The parties renew their arguments about whether a movant under 11 U.S.C. § 1104 must show the need for a trustee by clear and convincing evidence, as Woodlawn argues, or a preponderance of the evidence, as the U.S. Trustee argues. The parties agree that neither the Supreme Court nor the Seventh Circuit has addressed the issue in this context. Courts are divided on this question. *See In re López–Muñoz*, 866 F.3d at 497 n.5; 7 Collier on Bankruptcy ¶ 1104.02(4)(b) (noting that "courts are split").

Generally, unless the governing statute specifies a higher burden, or the Constitution demands a higher burden "because of the nature of the individual interests at stake," proof by a preponderance of the evidence is the default standard

in civil cases. *Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772, 778 (7th Cir. 2016); *see Grogan v. Garner*, 498 U.S. 279 (1991); *Herman & MacLean v. Huddleston*, 459 U.S. 375 (1983). The standard of proof allocates "the risk of error between the litigants" and indicates "the relative importance attached to the ultimate decision." *Huddleston*, 459 U.S. at 389 (quoting *Addington v. Texas*, 441 U.S. 418, 423 (1979)). A preponderance standard allows both parties to "share the risk of error in roughly equal fashion," while a heightened standard preferences one side's interests. *Id.* at 390 (quoting *Addington*, 421 U.S. at 423).

Courts recognize exceptions to the preponderance standard only when the government "seeks to take unusual coercive action." *Ramirez*, 845 F.3d at 778 (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 253 (1989)); *see Huddleston*, 459 U.S. at 389 (clear and convincing evidence is appropriate only when "important individual interests or rights" are at stake). For example, the termination of parental rights, involuntary commitment, deportation, and denaturalization all require proof by clear and convincing evidence. *Ramirez*, 845 F.3d at 778. When those types of individual rights are not implicated, proof by a preponderance of the evidence is the default standard. *Huddleston*, 459 U.S. at 389.

Here, the statute does not specify what standard of proof a bankruptcy court should apply. *See* 11 U.S.C. § 1104. Thus, some courts have relied on *Grogan* and *Huddleston* and held that the movant must satisfy the preponderance of the evidence standard when advocating for appointment of a Chapter 11 trustee. *See In re Keeley*

& *Grabanski Land P'ship*, 455 B.R. 153, 163 (B.A.P. 8th Cir. 2011); *Tradex Corp. v. Morse*, 339 B.R. 823, 832 (D. Mass. 2006).

Other courts require clear and convincing evidence. *See In re Bayou Grp., LLC*, 564 F.3d 541, 546–47 (2d Cir. 2009); *In re G-I Holdings, Inc.*, 385 F.3d 313, 317–18 (3d Cir. 2004) (Alito, J.). Bankruptcy courts in this district and elsewhere apply the heightened standard. *See In re Waterworks, Inc.*, 538 B.R. 445, 464–65 (Bankr. N.D. Ill. 2015); *In re LHC, LLC*, 497 B.R. 281, 291 (Bankr. N.D. Ill. 2013); *see also In re Sillerman*, 605 B.R. 631, 640–41 (Bankr. S.D.N.Y. 2019).

Courts that have endorsed the higher standard reason that appointing a trustee under § 1104(a) is an "extraordinary" remedy. *In re Bayou Grp.,* 564 F.3d at 546 (quoting 7 Collier on Bankruptcy ¶ 1104.02(2)(a)); *In re Sharon Steel Corp.*, 871 F.2d 1217, 1225 (3d Cir. 1989) ("It is settled that appointment of a trustee should be the exception, rather than the rule."). That is because typically, the debtor is most familiar with the organization, and is best suited to manage the company's reorganization. *In re Marvel*, 140 F.3d at 471. Courts have thus acknowledged a "strong presumption" that the debtor is to remain in possession. *Id.*; *In re LHC,* 497 B.R. at 291. Because of that presumption, "the standard for § 1104 is very high." *In re Smart World Techs., LLC*, 423 F.3d 166, 176 (2d Cir. 2005). The presumption is not a presumption in the "technical sense" under Rule 301 of the Federal Rules of

Evidence,[9] but rather a "synonym for the clear and convincing burden of persuasion." *In re G-I Holdings*, 385 F.3d at 318–19.[10]

With respect, I disagree. Preponderance of the evidence is the correct standard. The statute does not specify the standard of proof, and there is no reason to deviate from the default standard here. Perhaps a court's appointment of a trustee is a form of government coercion, but once a debtor seeks voluntary bankruptcy protection, it subjects itself to the full panoply of available statutory procedures. No one's individual rights are at stake. The only interest at issue is the management of a company or a nonprofit organization—not rights akin to those at stake in deportation, involuntary commitment, or parental termination proceedings.

Woodlawn argues that because appointing a trustee is an extraordinary remedy, the standard of proof should be higher. But whether a remedy is unusual or irregular is a separate question from whether it implicates important individual rights. What's more, the presumption that the debtor should remain in possession is not grounded in the statute; it is judicially created. And the courts that rely on the

---

[9] "In a civil case, unless a federal statute or these rules provide otherwise, the party against whom a presumption is directed has the burden of producing evidence to rebut the presumption. But this rule does not shift the burden of persuasion, which remains on the party who had it originally." Fed. R. Evid. 301.

[10] The idea that appointing a trustee is an extraordinary remedy, so must be justified by clear and convincing evidence, appears to have originated in bankruptcy courts in the 1980s. *See In re Tyler*, 18 B.R. 574, 577 (Bankr. S.D. Fla. 1982) ("All of the authorities agree that the appointment of a trustee under § 1104 is an extraordinary remedy. Therefore, the evidence to support the appointment of a trustee must be clear and convincing."); *Official Creditors' Comm. v. Liberal Mkt., Inc.*, 13 B.R. 748, 751 (Bankr. S.D. Ohio 1981) ("[T]here must be clear and convincing evidence to exercise an 'extra-ordinary remedy.'").

presumption use it as a synonym for clear and convincing evidence. But if those two things are same, then one does not follow from the other. In any event, even if there were a traditional statutory presumption here, the existence of a presumption does not mandate a higher standard of proof. Lots of important presumptions fall away when met with a preponderance of contrary evidence. *See, e.g.*, *Milanouic v. Holder*, 591 F.3d 566, 569 (7th Cir. 2010) (in removal proceedings, government may overcome presumption of alien's future persecution in home country by a preponderance); *see also Ark. Teachers Ret. Sys. v. Goldman Sachs Grp., Inc.*, 879 F.3d 474, 485 (2d Cir. 2018) (in securities fraud, defendant can rebut presumption of reliance by a preponderance); *Lovely Skin, Inc. v. Ishtar Skin Care Prod., LLC*, 745 F.3d 877, 883 (8th Cir. 2014) (in trademark, party seeking to cancel registration can overcome presumption of mark's validity by a preponderance); *McHan v. C.I.R.*, 558 F.3d 326, 332 (4th Cir. 2009) (in tax, taxpayer can rebut presumption that IRS Commissioner's determination of income is correct by a preponderance).

Woodlawn's reliance on *Microsoft Corp. v. I4I Ltd. P'ship*, 564 U.S. 91 (2011), is misplaced. *See* [17] at 26. In that case, the Court considered which standard of proof to apply to a showing of patent invalidity; the relevant statute specified that a patent "shall be presumed valid." *Id.* at 100. The Court found that there was a common-law presumption that patent invalidity required a heightened standard of proof. *Id.* at 101–02. Thus, when Congress wrote the presumption into the statute in 1952, the presumption carried its common-law meaning. *Id.* So, as a matter of statutory interpretation, the statute reflected the "universal understanding that a

preponderance standard of proof was too 'dubious' a basis to deem a patent invalid." *Id.* at 102 (quoting *Radio Corp. of Am. v. Radio Eng'g Labs.*, 293 U.S. 1, 8 (1934)).

Because the Supreme Court in *Microsoft* resolved the standard-of-proof question based on the statutory text, it had no need to consult *Grogan* and *Huddleston*. Courts need only consider what standard of proof to apply if the statute is silent. The *Microsoft* Court found that, as a matter of statutory interpretation, Congress intended a party arguing patent invalidity to demonstrate it by clear and convincing evidence. Here, by contrast, Woodlawn does not base its argument for a higher standard of proof in the text of the statute. Woodlawn does not argue that the presumption that a debtor remains in possession comes from pre-statute common law, like the presumption of patent validity. Nor, as noted above, is that presumption codified like the patent-validity statute. The Court's analysis in *Microsoft* was cabined to one statute with a specific interpretive backdrop. The statute here does not specify, or even suggest, an applicable standard of proof. *Microsoft* is inapposite. *See also Fishman Transducers, Inc. v. Paul*, 684 F.3d 187, 193 (1st Cir. 2012) (noting that *Microsoft*, the Court's "one recent decision" finding a heightened standard of proof, "rested primarily on statutory interpretation").

Ultimately, it doesn't matter which standard the bankruptcy judge applied, because she found that there was evidence justifying the appointment of a trustee under either standard. But I agree with the bankruptcy judge and the U.S. Trustee that the preponderance standard is the correct one.

## B.     The Appointment of a Trustee

Under 11 U.S.C. § 1104(a), at any time after the commencement of a case, the bankruptcy court shall order the appointment of a trustee either for cause, "including fraud, dishonesty, incompetence, or gross mismanagement" by "current management," 11 U.S.C. § 1104(a)(1), or if the appointment of a trustee is in the "interests of creditors." *Id.* § 1104(a)(2). Decisions under this section "must be made on a case-by-case basis." *In re Sharon Steel*, 871 F.2d at 1226. The bankruptcy court is given "broad discretion" in determining whether appointment of a trustee is justified. *In re G-I Holdings,* 385 F.3d at 321.

### 1.     For Cause

Incompetence, dishonesty, gross mismanagement, and fraud "cover a wide range of conduct." *Dalkon Shield Claimants*, 828 F.2d at 242 (citation omitted). Thus, a bankruptcy court has "wide latitude" to determine whether alleged misconduct rises to the level of cause. *In re The 1031 Tax Grp., LLC*, 374 B.R. 78, 86 (Bankr. S.D.N.Y. 2007) (citing *Dalkon Shield Claimants*, 828 F.2d at 242–43). In considering whether cause exists, a court must focus on the debtor's current management, not its past management. *In re Sharon Steel*, 871 F.2d at 1227. A trustee is not warranted if current management is "free from the previous management's taint." *Id.*

Here, the bankruptcy judge properly exercised her discretion in finding cause to appoint a trustee under 11 U.S.C. § 1104(a). The record supports the conclusion that Woodlawn engaged in gross mismanagement and dishonesty. The judge primarily focused on three instances of misconduct: the unpaid taxes, the unpaid rent

from Lincoln South, and Nixon's consulting fee, which violated the cash collateral order. Any one of those circumstances supported a finding of gross mismanagement, fraud, or dishonesty. For example, Finney engaged in a deliberate scheme to access employee payroll taxes by switching payroll processing companies and telling the new company that Woodlawn would handle payroll taxes internally in order to gain access to that money. He then treated employees' wages as an all-purpose fund that he could dip into for whatever purpose he saw fit. As the bankruptcy judge found, Finney essentially stole employees' wages. On top of that, Finney lied when, in the organization's Chapter 11 petition, he stated that management was surprised by the unpaid tax liabilities—he was the manager who personally directed the diversion of the payroll taxes.

Likewise, for about seven years, Woodlawn did not collect any rent from one of its properties. Putting aside any impropriety in Finney contracting with Lincoln South, his own company, in the first place, the judge reasonably concluded that this was an obvious case of self-dealing. By forgoing collecting rent from Lincoln South, Finney was opting to keep the rent for his other company.

Finally, defying a court order—such as paying Nixon a consulting fee that the bankruptcy judge explicitly forbade—is cause to appoint a trustee. The court banned Woodlawn from paying Nixon a consulting fee, and Woodlawn did it anyway. While Woodlawn protests that Nixon later entered into an employment contract, and eventually paid the consulting fee back, those later actions do not mitigate the fact that Woodlawn's new management defied a court order at the time. Taken together,

these circumstances more than support the court's finding that cause existed for appointment of a trustee. *See In re North*, 212 Fed. App'x 626, 626–27 (9th Cir. 2006) (finding debtor's noncompliance with a bankruptcy court's order, among other things, sufficient to support the bankruptcy court's finding of both cause and interests of the creditors); *In re Sillerman*, 605 B.R. at 645 (noting that "noncompliance with court orders" constitutes "cause" under § 1104(a)); *In re Morningstar Marketplace, Ltd*, 544 B.R. 297, 306 (Bankr. M.D. Pa. 2016) (appointing trustee based on debtor's noncompliance with cash collateral orders and unpaid taxes); *In re Euro-Am. Lodging Corp.*, 365 B.R. 421, 426 (Bankr. S.D.N.Y. 2007) (same, "failure to pay taxes").

Woodlawn does not seriously dispute that any of those circumstances constituted cause for appointment of a trustee. But it renews its argument on appeal that the judge erred in finding cause because Finney, the former CEO, was responsible for all of the organization's misdeeds. It asserts that once Nixon replaced Finney, the new management was independent of Finney's influence. The bankruptcy judge disagreed, and that factual finding was not clearly erroneous.

To be sure, § 1104(a) focuses on "current management." But as the bankruptcy court found, Woodlawn's management remained almost exactly the same under its new CEO. The people with oversight responsibilities who had allowed Finney to mismanage the organization—including Finney's daughter—stayed in their management roles. Given those circumstances, the bankruptcy judge correctly concluded that new management and old management were essentially the same. That was especially so because Finney remained involved in the organization as a

volunteer. And, Woodlawn's reorganization plan depended entirely on a donation that Finney had pledged to deliver from the sale of properties owned by his other organizations. Had that plan gone forward, Finney would have remained closely tied to Woodlawn. Nor was Nixon an independent party with no ties to Finney—he had been on the board of directors prior to becoming CEO, and was as complicit in Finney's mismanagement as any other director.

That Nixon was not sufficiently independent of Finney's influence became readily apparent in the months following Nixon's appointment. By February, when Nixon had been CEO for about four months, Nixon had not made any formal demand for the back rent that Lincoln South owed. Although Nixon asserted that Finney had promised to pay it, Nixon did not know if Finney had ever put that promise in writing. And Nixon could not answer how much rent Lincoln South owed to Woodlawn. Considering that Lincoln South had not paid rent for seven years, the judge reasonably interpreted Nixon's hesitancy as reluctance to take a hard line against Finney. Relying on Finney's word alone was clearly insufficient, given his history of deception, and Nixon's fumbling of the rent collection was an example of current management's incompetence.

Woodlawn does not dispute that the same in-house counsel, controller, and board of directors who ran the organization under Finney remained in place when the judge decided to appoint a trustee. But it takes issue with the judge's determination that anyone else in the organization knew or should have known about Finney's misconduct. [17] at 30. That is, the judge found that Reynolds either knew

or "should have known" about the unpaid rent from Lincoln South, and that both Reynolds and Smith "should have known about the essentially stealing of the payroll taxes to pay debt." [21-1] at 469. Woodlawn complains that the judge ignored the fact that Finney "had almost unfettered control over the organization," so no one else could have been involved. [17] at 30. But that "unfettered control" was exactly what concerned the judge. Contrary to Woodlawn's assertion, the judge did not determine that, as a factual matter, any other current Woodlawn employee knew what Finney had done. Rather, her conclusion was that people in Smith's and Reynolds's positions—high-level management roles—should have known what was happening in their organization. The court's finding was not error. That only Finney and Mohammad knew about the unpaid taxes does not inspire confidence in current management. Accepting Woodlawn's premise that senior-level managers were completely unaware of Finney's wrongdoing and Mohammad's involvement, implies that Woodlawn's upper management was so careless or absent that it permitted a CEO and CFO to misappropriate the organization's funds with no accountability or oversight. Woodlawn's argument reinforces the court's conclusion that the continued management under Nixon promised no significant change from the prior administration.

Along those lines, Woodlawn argues that the judge ignored Nixon's efforts to institute internal controls after becoming CEO. But the judge acknowledged Nixon's attempts; she just found those efforts insufficient, especially given the historic lack of internal controls and oversight in the organization, which was a "function of

current management." [21-1] at 471. That finding was not error. Absent any overhauls in leadership personnel, instituting internal controls was inadequate to meaningfully separate the old leadership from the new.

Woodlawn also argues that the bankruptcy court erred by not conducting an evidentiary hearing before appointing a trustee. It concedes that a full evidentiary hearing is not required in every case regarding the appointment of a trustee. [17] at 21; *see In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 167 (Bankr. S.D.N.Y. 1990) ('[A] bankruptcy court is not required to conduct a full evidentiary hearing."). But Woodlawn argues that it was denied due process when the judge declined to hold an evidentiary hearing because she did not adequately develop the record as to whether the new management team was sufficiently independent of Finney.

Generally, whether to hold an evidentiary hearing is within the trial court's discretion. *Sullivan v. Running Waters Irrigation, Inc.*, 739 F.3d 354, 359 (7th Cir. 2014). *See generally United States v. 8136 S. Dobson St.*, 125 F.3d 1076, 1086 (7th Cir. 1997). A judge may deny a hearing if the party seeking it "cannot show that an evidentiary hearing would have an articulable bearing on the material issues in dispute." *Sullivan*, 739 F.3d at 359.

The judge appropriately exercised her discretion in refusing an evidentiary hearing. First, she gave Woodlawn ample opportunity to develop the factual record. She held two hearings before granting the Committee's motion and, at the first hearing, invited Woodlawn to submit a response in writing to that motion and to include all relevant disputed facts. The judge specifically told Woodlawn's attorney to

address whether there was "an issue of fact that matters." [21-1] at 279. If Woodlawn had convinced the judge that disputed facts warranted exploration at an evidentiary hearing, the judge would have considered holding one. [21-1] at 278–79, 291. At that point, Woodlawn could have submitted affidavits from Jackson, Smith, Reynolds, Finney-Cook, or any other director explaining their independence from Finney. Instead, Woodlawn included only an affidavit from Nixon. Given that Woodlawn had the chance to present disputed facts and did not, it cannot now complain that it was denied an opportunity to develop the record. Absent any factual dispute, the judge properly granted the Committee's motion without an evidentiary hearing.

Moreover, Woodlawn suffered no harm from the court's decision to forgo an evidentiary hearing, because the judge relied on an exhaustive factual record in making her decision. That is, the judge reviewed the transcripts of three creditors' meetings at which different combinations of Nixon, Finney, Reynolds, and Smith all testified. During those meetings, Woodlawn officials answered questions from lawyers representing the U.S. Trustee, the Committee, the CHA, and two of Woodlawn's creditors, as well as Woodlawn's own attorney. The questions covered the unpaid payroll taxes, including who knew what, and when; Woodlawn's current management, including both salaried employees and the board of directors; the unpaid rent from Lincoln South and what steps Nixon had taken to recoup those funds; and Finney's ongoing role with the organization, among other things. Together, the three meetings spanned almost 200 transcript pages. *See* [21-1] at 70–179, 196–254, 319–46. Woodlawn takes issue with the judge's reliance on what it calls

"sound bites" from those meetings to determine that Nixon's leadership was tainted by Finney's misconduct. [17] at 22. But the record belies Woodlawn's claim that the judge did not adequately review the transcripts. To the contrary, on the day the judge granted the Committee's motion, she noted that she had received the transcripts of three creditors' meetings the day before, and had been "feverishly working through to digest all of that." [21-1] at 426. In other words, the judge made a fully informed decision based on a wide-ranging and thorough factual record.

Woodlawn suggests that an evidentiary hearing would have borne out only what Smith, Reynolds, and Finney already testified to at the creditors' meetings: that Finney and Mohammad orchestrated withholding the payroll taxes, and no one else knew what Finney was up to. [17] at 18. The judge already had that information, and no further fact finding would have helped Woodlawn's cause. *See Sullivan*, 739 F.3d at 359 (upholding denial of an evidentiary hearing where appellants did not identify what "would have been revealed on cross-examination, what questionable evidence there was or what credibility determinations needed to be made"); *S. Dobson St.*, 125 F.3d at 1086 (same, where court allowed appellant to submit supplemental evidence in writing, and appellant "has not identified any probative evidence which he was precluded from introducing").

Finally, Woodlawn argues that the judge should have held an evidentiary hearing on Woodlawn's proposed reorganization plan. But the judge reviewed that plan, questioned counsel for Woodlawn about it, *see* [21-1] at 369–72, and determined that it would not have been successful, a conclusion that the creditors agreed with.

That conclusion was sound. The reorganization plan assumed a continuing relationship with the CHA, which had no interest in working with Nixon going forward. And, the reorganization plan depended on a cash infusion donated by Finney from other organizations he managed, so the judge was rightly "concerned" to learn that "Dr. Finney is around this organization anymore." [21-1] at 370, 426. Given Finney's track record, a donation allegedly procured from Finney's other agencies was hardly a reliable lifeline. Moreover, neither the creditors nor the CHA supported the reorganization plan. Again, Woodlawn does not offer any insight into how an evidentiary hearing on the plan, which Woodlawn submitted to the court in writing, would have alleviated the judge's concerns about Finney's involvement. Notably too, any prejudice to Woodlawn was minimal, as appointment of a trustee did not preclude the organization from pursuing its proposed reorganization plan.

The bankruptcy judge did not abuse her discretion in finding cause for appointment of a trustee.[11]

---

[11] I decline to consider either Woodlawn's allegations about the trustee's post-appointment effect on the organization, *see* [17] at 23–24, or the Committee's assertions about the bankruptcy judge's rulings after the trustee took over. [33] at 2–4. Under the abuse-of-discretion standard, my review is limited to the evidence the bankruptcy judge had access to at the time she made her decision. *Pruitt v. Mote*, 503 F.3d 647, 659 (7th Cir. 2007) ("Evidence unavailable at the time discretion was exercised cannot be used to demonstrate abuse of that discretion."). Woodlawn repeatedly blames the CHA canceling its contract with Woodlawn on the appointment of a trustee, *see* [17] at 23; [29] at 15. That blame is misplaced. The agency explicitly stated that it had "lost all faith" in Woodlawn's management and did not support Nixon's appointment. All indications in the record suggest that the CHA would have canceled its contract whether or not the judge granted the § 1104(a) motion.

## 2. *Interests of the Creditors*

Section 1104(a)(2) is designed to be a "flexible standard" that gives the bankruptcy court discretion to appoint a trustee "when to do so would serve the parties' and estate's interests." *In re Marvel Entertm't*, 140 F.3d at 474 (quoting *In re Sharon Steel*, 871 F.2d at 1226). A number of factors inform the decision, including the debtor's trustworthiness, the debtor's performance and likelihood of rehabilitation, the confidence of creditors and the business community in current management, and the costs and benefits of appointing a trustee. *In re Sillerman*, 605 B.R. at 652. A trustee "can be appointed based solely on the creditor's lack of confidence" in the debtor. *Id.* at 655.

Here, the bankruptcy judge did not abuse her discretion in finding that appointing a trustee was in the interests of the creditors. All of the creditors who followed the case by appearing at the court's hearings supported the motion. When the judge asked who supported appointing a trustee, all of the creditors present nodded their heads yes. That group included a representative from the Committee, as well as a representative from a secured creditor. In addition to the creditors, both the U.S. Trustee and the CHA, Woodlawn's largest client, supported appointing a trustee. Given the agreement of everyone except Woodlawn itself, and the unanimous lack of confidence in Woodlawn's existing leadership, appointment of a trustee was justified. *See, e.g., In re Morningstar Marketplace, Ltd*, 544 B.R. at 305–06 (appointing a trustee under § 1104(a)(2) because of, among other things, "creditors'

frustration"); *In re The 1031 Tax Group, LLC*, 374 B.R. at 91 (same, noting creditors' "well-founded distrust and a lack of confidence" in debtor).

Woodlawn argues that the judge did not ascertain how every creditor felt about the Committee's motion. But there is no requirement that every creditor sign off on the appointment of a trustee. Rather, § 1104(a)(2) gives courts flexibility. Presumably, the creditors who repeatedly showed up to the creditors' meetings and court hearings were the most invested. Given that almost a month passed between the Committee filing its motion and the judge appointing a trustee, if any creditor were opposed to the appointment of a trustee, that creditor likely would have made its objection known. While Woodlawn complains that the judge erred by appointing a trustee without polling all of the creditors, it does not suggest that any creditor had an objection. The CHA was not a creditor, but § 1104(a)(2) contemplates the lack of confidence from both creditors and the business community. The agency represented Woodlawn's biggest business relationship. The CHA's counsel unequivocally stated that it had lost all "all faith" in Woodlawn's management, and, in particular, did not support appointing Nixon as CEO. [21-1] at 273–74. In this case, the CHA's lack of faith in Woodlawn was highly relevant to the business community's general attitude about appointing a trustee, especially when the agency's opinion was consistent with the creditors' view. The court's finding that appointment of a trustee was in the interests of the creditors was not an abuse of discretion.

## V.     Woodlawn's Social Service Mission

Woodlawn makes much of its status as a nonprofit organization, arguing that the bankruptcy court should have been particularly sensitive to the nature of the organization, and should have focused on allowing Woodlawn to continue providing housing services. [17] at 21. But the judge was fully aware of the unique nature of the organization, and even expressed hesitancy to appoint a trustee for a nonprofit. She noted Woodlawn's role in the community and acknowledged that it had done "plenty of good." It was for that exact reason that the judge felt Woodlawn needed an independent trustee to correct management's past mistakes, and the judge expressed her hope that a trustee would have a positive effect on the organization. There is no indication in the record whatsoever that the judge expressed any insensitivity to Woodlawn's mission, or to the communities it served.[12]

Woodlawn appears to suggest that its case warranted special consideration because it was a social-service organization, although it does not argue that, legally, § 1104(a) applies differently to nonprofits. Nor could it. Section 1104 does not distinguish between for-profit and nonprofit organizations, and Woodlawn points to no authority suggesting that the judge should have treated Woodlawn differently. The order here was not unprecedented. Courts have appointed Chapter 11 trustees

---

[12] The Committee moves to strike Woodlawn's allegations from its brief that the judge's decision to appoint a trustee was "racially insensitive." *See* [17] at 16; [22] at 5. Motions to strike sections of an appellate brief are disfavored. *Redwood v. Dobson*, 476 F.3d 462, 471 (7th Cir. 2007); *Custom Vehicles, Inc. v. Forest River, Inc.* 464 F.3d 725, 726 (7th Cir. 2006) ("[T]he way to point out errors in an appellee's brief is to file a reply brief, not to ask the judge to serve as editor."). The Committee had the opportunity to respond to Woodlawn's allegations in its own brief. The motion to strike is denied.

to run nonprofit organizations or organizations with charitable missions. *See, e.g.*, *In re United Church of the Ministers of God*, 74 B.R. 271, 279 (Bankr. E.D. Pa. 1987) (appointing a trustee to oversee a bankrupt church); *In re The Bible Speaks*, 74 B.R. 511, 514 (Bankr. D. Mass. 1987) (same).

Notably, other sections of the bankruptcy code specifically distinguish between for-profit companies and not-for-profit organizations, which the code refers to as corporations that are "not a moneyed, business, or commercial corporation." *See, e.g.*, 11 U.S.C. §§ 303(a), 1112(c). A non-moneyed business or commercial corporation is "equivalent to the modern-day terms 'not-for-profit' or 'non-profit.'" *In re Archdiocese of St. Paul & Minneapolis*, 888 F.3d 944, 952 (8th Cir. 2018). For example, a court may not convert a Chapter 11 case to a Chapter 7 case if the debtor is a nonprofit organization, unless the debtor requests it, 11 U.S.C. § 1112(c), and the code specifically excludes nonprofits from involuntary bankruptcy. *Id.* § 303(a). While Woodlawn asserts that this shows congressional intent to allow nonprofits to manage their own affairs, the opposite is true. When Congress includes "particular language in one section of a statute," but "omits it in another of the same Act," it is "generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Nken v. Holder*, 556 U.S. 418, 430 (2009) (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 432 (1987)). In contrast to §§ 303(a) and 1112(c), § 1104 does not distinguish among different types of debtors. If Congress wanted bankruptcy courts to apply different standards to nonprofit debtors, it would have said so in the statute, as it did elsewhere in the bankruptcy code. At least for purposes of § 1104,

mismanagement is mismanagement, regardless of the underlying purpose of the organization.

Finally, Woodlawn argues that appointing a trustee was the "death knell" of an "old and venerable community organization" that benefited underserved communities. But Finney rang that bell. Woodlawn's management allowed him to operate with virtually limitless discretion, and Woodlawn is now paying the price. The fault lies with management, not the judge.

## VI. Conclusion

The order of the bankruptcy court is affirmed.

ENTER:

Manish S. Shah
United States District Judge

Date: March 13, 2020